## W. T. CAPLE v. STATE.

No. A-243. Opinion Filed December 18, 1909.

(105 Pac. 618.)

1. INDICTMENT—Caption—Sufficiency. The omission of the word "the" before the words "State of Oklahoma" in the caption of an indictment is not fatal to the indictment.

2. RAPE—Appeal—Review—Verdict. (a) The statute makes the jury in the trial court the exclusive judges of all matters of fact, and this court will not disturb their finding, unless it is so clearly unsupported by testimony as to create a strong presumption that the jury was influenced by improper motives in reaching a verdict.

    (b) For facts supporting a conviction for rape see opinion.

3. NEW TRIAL—Newly Discovered Evidence. (a) When parties are indicted, they must recognize the fact that it is a serious matter, and be diligent in preparing for trial. It is too late after conviction to begin to investigate the character of the witnesses for the state, of whom they have notice before trial.

(b)   A new trial will not be granted on the ground of newly discovered evidence to impeach the reputation for truth and veracity of witnesses for the state.

(Syllabus by the Court.)

*Appeal from District Court, Carter County; Stilwell H. Russell, Judge.*

W. T. Caple was convicted of crime, and appeals. Amended and affirmed.

*Pruiett & Sniggs, E. G. McAdams,* and *E. B. Askew,* for appellant.

*Charles L. Moore,* Asst. Atty. Gen., for the State.

No briefs reached the reporter.

FURMAN, PRESIDING JUDGE. First. The first ground relied upon by the defendant is that the caption of the indictment is "State of Oklahoma v. W. T. Caple"; the contention being that it should have been "The State of Oklahoma v. W. T. Caple." This question was passed upon and settled contrary to the contention of the defendant in another case against this defendant, *ante,* p. 72, 104 Pac. 493. This court there held that the omission of the word "the" before the words "State of Oklahoma" in the caption of an indictment was not fatal to the indictment.

Second. The next ground relied upon is that the evidence does not support the verdict. It appears from the evidence that the defendant at the time of the trial was 35 years of age, and Mrs. Anderson, the prosecuting witness, 17. Mrs. Anderson had been married but a few months, and had recently come with her husband from their former home in Tennessee, and they were engaged, at the time of the alleged offense, in farming at Chagris, some distance from Ardmore. Both were entirely unacquainted at Ardmore, except with a family named Byers, at whose home Mrs. Anderson was stopping at the time of the alleged crime. It appears from the testimony of Mrs. Anderson that her husband had been arrested on a charge of mortgaging a team belonging to his cousin, but with his authority, and was confined in the county jail at Ardmore. The wife had come to Ardmore to em-

ploy counsel and procure bond for him. She had gone in the forenoon to the office of Attorney Coleman, who was representing Mr. Anderson, to see about the bond. The defendant was present, learned of the circumstances, and a few minutes after she had left the attorney's office approached her in a friendly way, assuring her that he had a friend, Charlie Thomas, a well to do farmer living out from Ardmore a few miles, whom he felt would sign the bond, and that he (the defendant) would also sign the bond, but could not schedule for enough alone without his friend Thomas, and proposed that they drive out and see him. It was accordingly arranged that after dinner they would go and see Thomas and arrange for the bond. They started to Thomas's place seven or eight miles southeast of Ardmore at 1:30 in the afternoon, going in a one-seated top buggy, with two-horse team. They reached the house of Nancy Franklin, a negress, between 2 and 3 o'clock. The defendant stopped here, got a drink of water, and inquired the way to Thomas', leaving the prosecutrix outside in the buggy. The negress pointed out the Thomas home, then in full view. The defendant returned to the buggy, and informed Mrs. Anderson that, owing to the road having been fenced, it would be necessary to make a detour around the fenced field in order to reach the Thomas residence; from this route he again detoured, and by all sorts of representations, without having ever gone to the Thomas residence, drove around all of the afternoon, claiming to be himself lost, and wound up at nightfall in a clump of timber in a large uninhabited pasture, where he found himself alone with this young unprotected woman, who had, in her desire to assist her husband, been lured to a lone spot, far from human aid, for the purpose of her forcible defilement by one who had posed as her friend. Although it was raining, he then unhitched his horses, and turned them out to graze. He then proceeded to detail to the terrified woman an account of his escapade, brought to the attention of this court in Case A-156, *ante*, p. 72, 104 Pac. 493, where a five-year sentence of imprisonment was affirmed for his murderous attempt to kill. After making a demand

for sexual intercourse, which was resented, calling the attention of the prosecutrix to her unprotected and helpless condition, notifying her of his intention to force her, and reminding her of his inflexibility and determination in all things, being one that whatever he proposed he performed, he exhibited a revolver, and laying the same down near him, commenced the assault, which after every resistance on her part, she was finally overcome, and the completed act of rape accomplished by the penetration of her person, the terrors engendered throwing the woman into a nervous chill.

It does not appear at what time in the night the crime was actually accomplished, but it is reasonable to suppose that the defendant himself would be willing, on account of the inclemency of the weather, to return to Admore as soon as his lustful monomania had temporarily subsided in being satisfied by the accomplishment of his purpose. The defendant left the prosecutrix at his own furnished house in Ardmore, in which there was no one at the time, where she stayed, not being able to locate the Byers home. Although she had had neither supper nor breakfast, she finally wept herself to sleep, and from her exhaustion and collapse did not awaken until nearly noon. She then went to Mrs. Byers, who observed her distressed and disheveled condition, her eyes swollen from much weeping, her mental condition perturbed; her body bruised from the encounter in endeavoring to resist the assault from the defendant. She examined her wounds four days later, after the preliminary examination, and still found her badly bruised.

The defendant took the stand in his own behalf. He testified to all of the facts of the trip related by the prosecutrix, except the sexual intercourse—this he denied; admitted having learned of the prosecutrix at Coleman's office and the facts of her husband's imprisonment; of her desire to secure bond for him; of himself seeking her out later in town, and voluntarily and unsolicited offering to see that the bond was made, although he had never heard of the prosecutrix nor her husband before, and had no knowledge of the character of the

offense charged against him; gave no reason for his interest in them, except his great magnanimity and sympathetic benevolence, going out to all persons in distress. Nowhere does he intimate that the prosecutrix had made any advances toward him; that her deportment on the trip was other than proper and ladylike. Although the defendant and his witness Tullis both gave testimony at the preliminary on the fourth day after the commission of the crime, it was very different from their evidence at the final hearing, and the later testimony bears upon its face the appearance of having been concocted to bolster up the defense. At the preliminary neither said anything of having seen the prosecutrix drink liquors, but both testified to this at the trial. This was the only matter at the hearing tending to place the prosecutrix in an unfavorable light, aside from the scurrillous affidavits in support of the motion for a new trial, and was immaterial for the purpose of this case, except as affecting her credibility as a witness. Mrs. Byers, a respectable woman, was with the girl very soon after Tullis says he saw her drinking whisky. She was close to her, assisting and sympathizing with her in her distress, examining her person and apparel, and had every opportunity to detect the effects of liquor in her manner and upon her breath. She observed no evidences of this kind, but saw only a heart-broken woman, weeping and grieving over her calamitous sorrow. The two drinks which Tullis and the defendant say they saw the prosecutrix take about noon Tuesday would have, upon an empty stomach—she not having partaken of food since noon the day before—certainly produced an intoxication which would have been readily observed by Mrs. Byers.

Our statute makes the jury in a trial court the exclusive judges of all matters of fact. While this court has the power to set aside their findings upon questions of fact, yet it is without the right to do so unless the verdict is so clearly unsupported by the testimony as to create a strong presumption that the jury was influenced by prejudice or some other improper motive in

3 Cr.—40

deciding the case. There is nothing in this record which would warrant us in reaching such a conclusion. We are therefore without rightful power to disturb the verdict.

Third. The third and last ground relied upon to secure a new trial is alleged newly discovered evidence to the effect that the prosecuting witness was a woman of bad reputation for chastity in the community where she last resided. In support of this ground the defendant filed the following affidavit:

"State of Oklahoma, v. W. T. Caple, Dft. Affidavit. Now comes the affiant W. R. Watkins, and states that he is personally acquainted with Mary E. Anderson, better known as (Shine) the prosecuting witness against W. T. Caple, on the charge of rape, affiant states that he knows her general reputation of the said Mary E. Anderson for chastity and virtue in the neighborhood where she last resided in, and her reputation for virtue is bad. Affiant states she had the reputation of having the disease known as gonerarior, and is known as a common prostitute where she lived soon after the time she made the said charge against the said W. T. Caple. The affiant W. R. Watkins says under oath that he has heard the foregoing statement read and states that they are true. · W. R. Watkins. Subscribed and sworn to before me by W. R. Watkins this December 22, 1908. A. K. Swan, Notary Pub. of Carter Co. Okla. [Seal.] Commission expires July 3, 1909."

"The State of Oklahoma, Pltf., v. W. T. Caple, Deft. Affidavit. Comes Mrs. Lou Catherine Watkins and states that she is a citizen of Jefferson County, Okla., and that she is personally acquainted with Mrs. Mary E. Anderson, better known as (Shine) the prosecuting witness against W. T. Caple, on the charge of rape, and that said Mary E. Anderson lived with this affiant about three weeks as a helper, that she had some kind of disease and what I saw of her and what I heard of her I think she is a woman not worthy of the associates of a lady and I made her leave my home. The affiant Mrs. Lou Catherine Watkins states upon her oath that she had read this affidavit and it is true. Lou Catherine Watkins. Subscribed and sworn to before me by Mrs. Lou Catherine Watkins, this December 31, 1908. L. L. Lee, Notary Public for Jefferson County, Okla. [Seal.] Commission expires Apl. 10, 1911."

Even if it be conceded that the statements contained in

these affidavits would be admissible in evidence if offered during the trial of this case, yet they do not come within the rule relating to newly discovered testimony, which governs in motions for a new trial. This offense is alleged to have been committed on July 13, 1908. Within a few days thereafter the defendant had a preliminary trial on this charge. The prosecuting witness testified at that trial. The final trial of the defendant took place in December, 1908. The defendant knew all of this time that Mrs. Anderson would be a witness against him. The defendant had ample time and opportunity to investigate the character of the witness for truth and veracity, 'if he desired to do so. It is too late after a conviction for a defendant to begin to make inquiries of this character. When parties are indicted they must recognize the fact that it is a serious matter, and they must be diligent in preparing for their defense. This court will not encourage carelessness and negligence of this kind. It is the settled law that a new trial will not be granted on the ground of newly discovered evidence to impeach the reputation for truth and veracity of witnesses for the state. *Herber v. State*, 7 Tex. 70; *Davidson v. State*, 33 Tex. 248; *Dansby v. State*, 34 Tex. 393. *Gibbs v. State*, 1 Tex. App. 12-19; *Hauck v. State*, 1 Tex. App. 357-360; *Thompson v. State*, 2 Tex. App. 289; *Terry v. State*, 3 Tex. App. 236-239; *Higginbotham v. State*, 3 Tex. App. 447-450; *Love v. State*, 3 Tex. App. 501; *Boothe v. State*, 4 Tex. App. 202; *Watson v. State*, 5 Tex. App. 11-29; *Tooney v. State*, 5 Tex. App. 163-185; *Brown v. State*, 6 Tex. App. 286-314; *Polser v. State*, 6 Tex. App. 510-512; *Walker v. State*, 6 Tex. App. 576-608; *Burton v. State*, 9 Tex. App. 605-608; *Jackson v. State*, 18 Tex. App. 586-597; *Grate v. State*, 23 Tex. App. 458-462, 5 S. W. 245; *McCoy v State*, 27 Tex. App. 415-434, 11 S. W. 454; *Estrada v. State*, 29 Tex. App. 169, 15 S. W. 644; *Barber v. State*, 35 Tex. Cr. R. 70-73, 31 S. W. 649; *Miller v. State*, 35 Tex. Cr. R. 209, 33 S. W. 227; *Butts v. State*, 35 Tex. Cr. R. 364, 33 S. W. 866; *Scruggs v. State*, 35 Tex. Cr. R. 622-626, 34 S. W. 951; *Cruse v. State*, (Tex. Cr. App.) 21 S. W. 370; *Lewis v. State* (Tex. Cr. App.) 22 S. W. 687;

*Messic v. State,* (Tex. Cr. App.) 25 S. W. 626; *Walker v. State,* (Tex. Cr. App.) 33 S. W. 372; *Priest v. State,* (Tex. Cr. App.) 34 S. W. 611; *Storms v. State,* (Tex. Cr. App.) 37 S. W. 439; *Wright v. State,* (Tex. Cr. App.) 40 S. W. 1096; *Porter v. State,* (Tex. Cr. App.) 42 S. W. 305; *Alexander v. State,* (Tex. Cr. App.) 42 S. W. 989; *Poteet v. State,* (Tex. Cr. App.) 43 S. W. 339; *McNeal v. State* (Tex. Cr. App.) 43 S. W. 792; *Navarro v. State,* (Tex. Cr. App.) 45 S. W. 724; *Fields v. State,* 39 Tex. Cr. R. 488, 46 S. W. 814; *Holt v. State,* 39 Tex. Cr. R. 282, 46 S. W. 829; *Lawson v. State,* (Tex. Cr. App.) 50 S. W. 345; *Mirando v. State,* (Tex. Cr. App.) 50 S. W. 714; *Shilling v. State,* (Tex. Cr. App.) 51 S. W. 240; *Ford v. State,* (Tex. Cr. App.) 51 S. W. 935.

It appearing that the defendant was sentenced to imprisonment at hard labor in the penitentiary at Lansing, Kan., for a period of 10 years, time of service to commence at his delivery to the warden of said penitentiary, said judgment and sentence is amended to read that such imprisonment shall be in the penitentiary at McAlester, state of Oklahoma. In all other respects, the judgment of the lower court is affirmed.

DOYLE and OWEN, JUDGES, concur.